## Case No. 18,112.

### In re WYLLIE.

[2 Hughes, 449; [1] 5 Am. Law T. Rep. U. S. Cts. 330.]

District Court, W. D. Virginia.　Sept., 1872.

AMENDATORY BANKRUPT ACT — CONSTRUCTION — HOMESTEAD AND EXEMPTIONS.

1. The amendatory bankrupt act of June 8th, 1872 [17 Stat. 334], does not purport to embrace the homestead in the terms employed by the constitution, so as to make it good against debts "heretofore contracted," which it is conceded congress might have done if it had chosen.

2. The reference to "state exemption laws" confines the inquiry under this act to exemptions under state laws as interpreted and settled by the adjudication of its highest court, and precludes the court of bankruptcy from contravening that adjudication whenever made.

3. The homestead exemption exists only against debts contracted after the constitution took effect, and is by its terms subject to mortgages, deeds of trust, pledge or other security (including liens) thereon, notwithstanding the saving in the second section of the eleventh article.

[Cited in Re Vogler, Case No. 16,986; Re Kean, Id. 7,630; Re Smith, Id. 12,986.]

4. The act of June 8th, 1872, is not retroactive, but as a remedial act its benefits should be extended to all pending cases where the effects of the bankrupt are undisputed and it can be done without prejudice to vested interests.

5. The paramount duty of the court of bankruptcy to provide for the liquidation of liens forbids it to turn over the subject to another tribunal for litigation or adjustment, but requires it to abstract from the homestead provision the amount of liens rightfully attaching thereto.

In bankruptcy. This case was heard in conjunction with several others, involving the question of homestead.

E. Barksdale, C. E. Dabney, T. S. Flournoy, E. Barksdale, Jr., and Robert Johnson, for petitioners.

H. Robertson, B. Green, J. M. Whittle, William Daniel, N. Green, and W. W. Henry, for defendants.

RIVES, District Judge. These cases are now heard on the petition of bankrupts to be allowed the homestead exemption of the state

under act of congress of June 8th, 1872. The first of these petitioners was adjudicated a bankrupt on the 29th day· of June last; had listed real estate valued at $3000, unincumbered, except by a judgment of about $300, but no personal property of which he could claim a homestead. His debts are mostly anterior to July, 1868, and it is admitted that those before that date are more than sufficient to absorb the .assets. His estate is about to be sold, and he asks to be allowed this $2000 exemption out of the proceeds of sale in the hands of his assignees, and claims that it should be free of the lien of the judgments aforesaid. The second petitioner, Jerre White, was adjudicated a bankrupt on 26th August, 1871. He alleges in his petition that, before filing his petition in bankruptcy he filed his "homestead deed," in·compliance with the act of assembly, but that the same was held to be void by the state court; that his lands have been sold by his assignee, and he became the purchaser of the "home tract," but has not paid for the same. He therefore· prays that he may be allowed out of the money to be received by his assignee $2000 as and for a homestead provision, to be settled on his wife and children. It is admitted that his debts were contracted previously to July, 1869. [As the questions involved in these cases concerned many other suitors in this court besides the immediate parties, I deemed it proper to invite discussion from the members of the bar, who might be pleased to assist and enlighten me by their arguments, though they might not be directly interested in these particular cases. My invitation was courteously acceded to, and for two days I have been closely occupied by able and discursive arguments, presenting the questions I am to decide in every aspect ingenuity could lend them. I should be loth to decide these cases amid the pressure of other business at this court if my studies had not given me some familiarity with the topics discussed, and if I did not feel the pressing necessity of composing the public anxiety on this subject.][2]

I am called for the first time to give my opinion on the subject of these petitions. To determine the question thus raised it is necessary to ascertain the effect of the amendatory act of June 8th, 1872. It is brief. It merely substitutes one date for another in the first proviso, in section 14 of the general act, so that this proviso now reads as follows: "And such other property not included in the foregoing exceptions as is exempted from levy and sale upon execution, or other process, or order of any court, by the laws of the state in which the bankrupt had his domicil at the time of the commencement of the proceedings in bankruptcy, to an amount not exceeding that allowed by such state exemption laws in force in the year 1871." The date prescribed for these state exemption

---

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

[2] [From 5 Am. Law T. Rep. U. S. Cts. 330.]

laws in the original act was the year 1864, and, of course, deprived bankrupts in this state of the homestead provisions of our constitution adopted in 1869. I presume that constitution went into operation July 6th, 1869. I can find nothing in the constitution itself, nor in the schedule and election ordinance appended to it, fixing the time at which it should take effect. Nor do I suppose that the terms prescribed by congress, upon the readmission of the state into the Union and to representation in congress, at all suspended or delayed the birth of the constitution. Hence I revert to the proclamation of the president, under date of 14th May, 1869, submitting the constitution to the people on the 6th July, 1869, for ratification or rejection, and accept the date of the actual ratification as the date of its birth. The adoption of the fourteenth and fifteenth amendments, which was made a condition precedent to the restoration of the state to the Union, and which occurred on the 8th of October, 1869, and the approval by congress of our constitution as republican, and its consent to our admission to congressional representation, which was declared by act of congress of January 26th, 1870 [16 Stat. 62], are facts extraneous, according to my idea, to the question when the constitution became the fundamental law of this commonwealth, and are such as affect only its external relations, and not its interior organization or autonomy.

The impression exists that our court of appeals, in the case of Griffin's Ex'r v. Cunningham, 20 Grat. 31, assumed January 26th, 1870, as the date when the constitution took effect. This seems to me a mistake. They properly took this date as the end of military rule under the reconstruction acts, and the end of official tenures under the same, and as the period of complete governmental organization under the constitution, declared as republican, and the admission to congressional representation ordained by the act of January 26th, 1870. But this plainly does not touch the present question, from what period that instrument as establishing new rights or rules of property, shall be deemed operative. It certainly existed for some purpose before that date, otherwise there was no constitutional assembly in October, 1869; and its ratification at that time of the constitutional amendment was void. While it may be said that the assembly was called into existence under the reconstruction acts of congress, it must be conceded that congress could by no act of its own alter or affect the mode prescribed by the constitution for the ratification of amendments thereto. Though it be admitted that the constitution was only provisional until its acceptance by congress, in the sense and under the theory of the reconstruction acts, still, in legal contemplation, its operation, upon the event of its complete authority, should relate back to its ratification, and this latter date, when the seal of public approval was given to it at the polls,

be assumed as the rightful one by which rights accruing thereunder, and contracts regulated thereby, should be governed. It will scarcely be contended that this article did not confer clear rights of property, independent of legislative action, and that the reference therein to the assembly was merely for auxiliary details, under an express prohibition "to defeat or impair the benefits intended to be conferred by the provisions of this article." No neglect of the legislature to pass a law on the subject could at all abrogate the rights conferred by this article; it was operative of itself, and did not depend on a law of the assembly. I find nothing decisive of this point in the late case of Tackett v. Stone, 22 Grat. 266. It did not become necessary to ascertain in that case when the homestead took effect, nor does the court seem to have fixed a precise date therefor, though I concede there are incidental remarks in the opinion of the court to the effect that until the constitution was approved, and senators and representatives elected under it admitted, it did not become the organic law of the state, and as such binding upon the citizens thereof. The acts of assembly to which I have been referred for a legislative recognition of the date from which the constitution takes effect, purport only to fix the limit of the provisional military government, and the complete restoration of the state to the Union, which I do not doubt is properly fixed as January 26th, 1870. But it is not necessary to decide this question in these cases. The present inclination of my mind is, for the reason I have assigned, to take the date of the ratification of the constitution as the period from which the homestead provision became operative. As I find nothing decisive on the subject in the decisions of the court of appeals of this state, according to my view of them, I throw out this suggestion for the consideration of that bench and the learned bar of this state. Whatever, however, may be assumed as the period of the commencement of the homestead, whether 6th July, 1869, or 26th January, 1870, it is clear that the amendatory act of congress of 8th June, 1872, adopting as a part of the bankrupt exemption the additional benefit of the state exemption laws in the year 1871, embraces the homestead provisions of our constitution. This act was introduced by a senator from this state, and was designed to include our homestead provision. It clearly does so.

The question now arises, what is the nature, extent, and operation of that exemption, and how shall these be determined? The orderly examination of this question leads first to an inquiry into the scheme and theory of the bankrupt law on this subject of exemption. The establishment of a uniform system of bankruptcy is supposed to involve the idea of a discharge, greater or less, from precedent obligations. So far, confessedly, congress has the right to impair the

obligations of contracts. In the Legal-Tender Cases (Knox v. Lee and Parker v. Davis) 11 Wall. [78 U. S.] 459, this is incidentally conceded in the opinions both of the majority of the court and of the dissenting justices. The only difference was whether this power over contracts extended to the incidental or implied powers as well as the express powers, the dissenting justices admitting its application to the latter, but denying it as to the former, while Justice Strong, of the majority, declared with emphasis: "There was no ground for any such distinction. It has no warrant in the constitution or in any of the decisions of this court. We are accustomed to speak, for mere convenience, of the express and implied powers conferred upon congress. But in fact the auxiliary powers, those necessary and appropriate to the execution of other powers simply described, are as expressly given as is the power to declare war or to establish uniform laws on the subject of bankruptcy. They are not catalogued, no list of them is made, but they are grouped in the last clause of section 8 of the first article, and granted in the same words in which all other powers are granted to congress. And this court has recognized no such distinction as is now attempted." It may, therefore, be admitted that it is clearly within the competency of congress to grant a retrospective exemption so as to discharge antecedent obligations. Congress, in such a bankrupt law, might, if it chose, insert such a homestead provision as we have, making it good against any debts heretofore contracted, although its inevitable effect would be to impair the obligation of contracts; and for this simple reason, that the power to such an end is expressly given by the United States constitution. In the same way the power to regulate commerce, declare war, etc., may not be exerted without impairment of contracts, and yet it cannot be disputed because of this resulting injury from its exercise. I therefore concede the power of congress in the enactment of a bankrupt law to make exemptions in the very terms of our homestead provision, embracing past as well as future debts. But the question here is not what congress may do, but what congress has done; nor what the authors of this late act may have designed, but what they have accomplished.

To facilitate our inquiry in this direction, I submit a cursory analysis of the 14th section of the bankrupt law [of 1867 (14 Stat. 522)]. The exemptions are twofold: First, such as are made in the first instance by congress, and secondly, such as have been made by the states. The first comprise four particulars: 1, necessary household and kitchen furniture, and other articles and necessaries, not to exceed in value the sum of five hundred dollars; 2, wearing apparel; 3, uniform, arms, and equipments of a soldier in the militia or federal army; and 4, such other property as is now, or hereafter shall be, exempted by the laws of the United States. The second class has one comprehensive designation, which it is well here to repeat in the language of the act now amended: "And such other property not included in the foregoing exceptions as is exempted from levy and sale, upon execution or other process or order of court, by the laws of the state in which the bankrupt has his domicil at the time of the commencement of proceedings in bankruptcy, to an amount not exceeding that allowed by such state exemption laws in force in the year eighteen hundred and seventy-one." Our concern is now exclusively with this second class of state exemptions, recognized and validated by the act of congress. It is but a part of the policy which led to the act of May 19th, 1828 [4 Stat. 278], and the practice of the federal courts under it. That statute provides that the proceeding upon execution in the courts of the United States shall be the same as were then used in the courts of each state, and empowers the courts of the United States, by rules of practice, to make such proceedings conformable to any changes thereafter adopted by any legislature of the respective states. Through this act, and subsequent rules of practice adopted as authorized by it, the practice in the federal and state courts was, in 1864, generally the same as to the exemption of the property of debtors under execution. This provision of the bankrupt law, therefore, only entitles the bankrupt to the same exemption as he would have had in the federal courts, if pursued by executions issued therefrom. An objection has been made to the constitutionality of this provision, for its lack of uniformity, because of the variety of these state exemptions. But it has been held that the law itself is uniform in its principles, but diverse only in its application or operation within the states, owing to the respect which congress pays to state laws. It has been generally acquiesced in. The policy of the legislature, and the practice of the judicial departments of the United States government, and the principles upon which the bankrupt law is framed and depends, do, therefore, alike support the idea that, upon questions of state exemptions, we must consult and be governed by the state codes alone. The judiciary act of 1789 [1 Stat. 92] embraces the same principle in its 34th section, that "the laws of the several states, except when the constitution, treaties, or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States where they apply." It has been well held that this provision is a mere legislative recognition of the principles of universal jurisprudence as to the operation of lex loci. Wayman v. Southord, 10 Wheat. [23 U. S.] 1. Indeed, I do not see how, upon any other principle, our judicial system. state and federal, could consist and act in their separate

and well-defined provinces without injurious clashings and serious interruptions to the harmony of both governments. Hence I recognize it as an elementary principle at the foundation of the department to which I belong, that when called upon to decide upon rights of property in my district under the local laws of the state, I am bound thereby as the same are expounded by the state tribunals. A statute consists not merely of its terms, but of the judicial exposition thereof, so that if a law of the state has been construed by the highest court of the state, I am bound by that construction, and relieved of all necessity of examining the same, and forming my opinion of what is already authoritatively settled for me. And this follows from the fact that I, like the state judge, administer the laws of Virginia where they settle the question submitted to me; and if I depart from them, I am depriving the citizen of the benefit of the laws under which he lives. The further and qualifying principle, that upon [questions of general jurisprudence independent of local laws, and upon] [2] such as affect the constitution, treaties, and statutes of the United States, I am free to form my own judgment, and am not bound by the decisions of the state courts, admirably serves to show how our different sets of courts may move on harmoniously, and vie with each other in raising upon the foundation our fathers have laid for us a structure of enlightened jurisprudence, suitable to the wonderful progress of our country and the new dispensation of science, which is removing from the intercourse and trade of nations the obstacles of space and time.

These general considerations, growing out of the nature of our complex government, and the relation of our state and federal judiciaries, prepare us to determine what is now to be regarded as our homestead exemption. It is declared by our state constitution in these words: "Every householder or head of a family shall be entitled, in addition to the articles now exempt from levy and distress, to hold, exempt from levy, seizure, garnisheeing, or sale, under any execution, order, or other process, issued or any demand, for any debt heretofore or hereafter contracted, his real and personal property or either, including money or debts due him, whether heretofore or hereafter acquired or contracted, to the value of not exceeding two thousand dollars, to be selected by him." It is needless, for the purpose of the present inquiry, to quote more of this article 11. I refer, besides, to the second section thereof, which I understand as making this homestead superior to the lien of execution where the property has been restored; and to the lien of "judgment rendered or docketed on and after the 17th day of April, 1861, and before the 2d

day of March, 1867, for any debt previous to the 4th day of April, 1865, excepted," etc. The feature of this provision, which challenged general inquiry, was its retroactive effect upon anterior debts and judicial liens in the two instances I have cited. The general provision in the third section subordinated this claim to "any mortgage, deed of trust, pledge, or other security thereon." Hence, by the terms of this section, this exemption could not stand against any voluntary incumbrance, such as "mortgage, deed of trust, or pledge," nor involuntary incumbrances, such as execution or judgment liens, which I take to be covered by the concluding phrase, "other security thereon." It may not be inapt to state here that this constitutional provision clearly comes under the designation of the 14th section of "state exemption laws," the constitution being the highest fundamental law of the state. So far as the allowance of this exemption against debts subsequent to the time when it took effect is concerned, there has been no doubt or difficulty. But the question naturally arose, whether it could affect or impair anterior obligations, and if so, whether it was not obnoxious to the constitutional inhibition upon the states to pass any law impairing the obligation of contracts. This question was differently decided in the circuits by able and learned judges. It has, however, been finally settled by the supreme court of appeals with entire unanimity. That decision settled the law for the state. Its effect is literally to expunge from the 1st section of the homestead clause the word "heretofore," so as to leave it applicable only to debts hereafter contracted, and also in my view to render nugatory the 2d section in relation to anterior liens of certain specified executions and judgments. This clause of the constitution is now to be read as if it were virtually altered in the text, so as to conform literally to the construction placed upon it by the highest judicial tribunal of the state. I can go no further to ascertain its meaning and its effect. I am not free to form an opinion of it judicially; and it would be supererogatory if not impertinent to express one. I must take and administer this law of the state as I find it settled by the highest and final court of the state. Any other course on my part would offend against the theory I entertain of the functions of our separate judiciaries, state and federal, and would render me culpable in my own eyes for having attempted to mar the symmetry and disturb the harmony of that wisely constructed system of courts for administering the law of both governments.

It must not be forgotten that I am now disposing of a question of "state exemptions" under the fourteenth section of the bankrupt law. That of the congressional direct exemption to the bankrupt is upon a

---

[2] [From 5 Am. Law T. Rep. U. S. Cts. 330.]

different footing, and is necessarily a matter for the exclusive cognizance and decision of this court, but when congress chooses to add to its own list of exemptions further exemptions under "state laws," it refers this court in its action thereupon to those state laws, and the discussion must turn upon the construction of those statutes. I do not doubt it would have been in the power of congress to have given to bankrupts a homestead in the retrospective terms of our clause. The only obstacle in the way would be the direct enactments of variant exemptions in the different states. But this congress has not attempted to do. The alteration of the date in the fourteenth section only availed to extend the benefits of exemptions to such additional ones as the state had made between 1864 and 1872. This is the whole effect of the amendatory act of June 8th, 1872. I do not doubt that the projectors and authors of this law, without due consideration, supposed it would give validity and operation to the homestead exemption as expressed in the eleventh article of our constitution. But I feel confident upon further reflection and examination, they will see that they have not accomplished that object but have only extended the relief under it so far as the court of appeals has allowed it, namely, as against debts contracted subsequently to the operation of the constitution, which, in my view, dates from the ratification, the 6th July, 1869.

To this conclusion I have been conducted by general reasoning upon the principles of our judicial systems, and the interpretations of the fourteenth section of the bankrupt law. I now turn to authorities for this opinion. They are elementary and abundant. A leading case is that of Elmendorf v. Taylor, 10 Wheat. [23 U. S.] 162, in which Chief Justice Marshall says: "The court has uniformly expressed its disposition, in cases depending on the laws of a particular state, to adopt the construction which the courts of the states have given to those laws. This course is founded on the principle supposed to be universally recognized, that the judicial department of every government, where such department exists, is the appropriate organ for construing the legislative acts of that government. Thus no court in the universe which professes to be governed by principles would, we presume, undertake to say that the courts of Great Britain, or France, or of any other nation, had misunderstood its own statutes, and therefore erect itself into a tribunal which should correct such misunderstanding. We receive the construction as given by the courts of the nation, as the true sense of the law, and feel ourselves no more at liberty to depart from that construction than to depart from the words of the statute. On this principle the construction given by this court to the constitution of the United States is received by all as the

true construction, and on the same principle the construction given by the courts of the several states to the legislative acts of those states, is received as true, unless they come in conflict with the constitution, laws, or treaties of the United States." So again in Polk's Lessee v. Windell, 9 Cranch [13 U. S.] 87, it is held, "In cases depending on the statutes of a state, and more especially those relating to titles to land, the federal courts adopt the construction of the state where that construction is settled and can be ascertained." In Gardner v. Collins, 2 Pet. [27 U. S.] 58; Inglis v. Trustees of the Sailors' Snug Harbor, 3 Pet. [28 U. S.] 127; U. S. v. Morrison, 4 Pet. [29 U. S.] 129; and Hinde v. Vattier, 5 Pet. [30 U. S.] 398,—the same controlling principle is announced variously as follows: "Where the question of the construction of the statutes of a state has been settled by judicial decision in the state where the land lies, the supreme court of the United States, upon the uniform principles adopted by it, would recognize that decision as part of the local law." "The uniform rule of this court with respect to titles to real property is to apply the same rule which is applied in state tribunals in like cases." "The supreme court, according to its uniform course, adopts the construction of the act which is made by the highest court of the state." This principle is carried so far that the supreme court abnegates its own judgment, and surrenders its own opinion when not in accordance with the construction settled in the state courts. McKeen v. Delancy, 5 Cranch [9 U. S.] 22. It reviews and recedes from its opinion, though in accordance with two decisions of the state, when satisfied that the law was finally settled otherwise by the highest court of the state. This was the noteworthy case of Green v. Neal, 6 Pet. [31 U. S.] 298. The language of this case is most pertinent to our present discussion, and I must be pardoned for making copious quotations from it. Judge McLean delivering the opinion of the court made this comment on the peculiar feature of the case: "But the question is now raised whether the court will adhere to its own decision made under the circumstances stated. or yield to that of the judicial tribunals of Tennessee. This point has never before been decided by this court on a question of general importance. The cases are numerous where the court has adopted the construction given to a statute of the state by its supreme judicial tribunal, but it has never been decided that this court will overrule their own adjudication establishing an important rule of property when it has been founded on the construction of a statute made in conformity to the decision of the state at the time, so as to conform to a different construction adopted afterwards. In a great majority of causes brought before the federal tribunals they are called in to enforce the laws of the states. The rights of parties are determined under

these laws, and it would be a strange perversion of principle if the judicial exposition of these laws by the state tribunals should be disregarded. These expositions constitute the law and fix the rule of property. Rights are acquired under this rule, and it regulates all the transactions which come within its scope. On all questions arising under the constitution and laws of the Union, this court may exercise a revising power, and its decisions are final and obligatory on all other judicial tribunals, state as well as federal. A state tribunal has a right to examine any such questions and to determine thereon, but its decision must conform to that of the supreme court, or the corrective power may be exercised. But the case is very different when the question arises under a local law. The decision of the question by the highest tribunal of a state should be considered as final by this court, not because the state tribunal in such a case has any power to bind this court, but because in the language of the court in the case of Shelby v. Guy, 11 Wheat. [24 U. S.] 361. a fixed and received construction by a state in its own courts, makes a part of the law. If the construction of the highest tribunal of a state forms a part of the statute law as much as an enactment of the legislature, how can this court make a distinction between them? The inquiry is, what is settled law of the state at the time the decision is made? This constitutes the rule of property within the state, by which the rights of litigant parties must be determined. And the construction of a state law having been settled by a series of decisions of the highest state court, differently from a former decision of the supreme court, the latter construction of such law will be adopted in the federal courts."

It was from this course of reasoning the court felt constrained in this case to overrule its former decision and conform to the later decisions in Tennessee. The language of Justice McLean. in depicting the consequences of a different course, bears with great emphasis on the question I am now deciding. "Here," says he, "is a judicial conflict arising from two rules of property in the same state, and the consequences are not only deeply injurious to the citizens of the state, but calculated to engender the most lasting discontents. It is therefore essential to the interests of the country and to the harmony of the judicial action of the federal and state governments, that there should be but one rule of property in the state." It would hardly be presumed that a different rule would obtain as to the interpretation of a state constitution from that already indicated for state laws. To preclude any such distinction, I cite the cases of East Hartford v. Hartford Bridge Co., 10 How. [51 U. S.] 511; Webster v. Cooper. 14 How. [55 U. S.] 489; and Randall v. Bingham, 7 Wall. [74 U. S.] 513,—for the position that the decision of the highest court of a state upon a question arising under the state constitution as binding on the federal courts, and that the construction given by such state court to a provision of its state constitution, not called into question by any conflicting opinion of that court, is in like manner conclusive. I have not exhausted the authorities on this head. I have not sought to do so. I have not inquired into the limitations and exceptions to this doctrine, as they do not affect the questions under consideration. Abbott gives a summary of the cases in these words: "The courts of the United States look to the several states as the appropriate and authoritative expounders of the legislation of their respective governments, and whenever the courts of a state judicially settle the construction of a state statute. the courts of the United States are bound thereby, and will give effect to such statutes accordingly, saving, however, vested interests from being prejudiced by changes of construction. But in cases of conflict or fluctuations in the opinions of the state courts. the supreme court will interpret the statutes by their own judgment." Abb. U. S. Treatise, 240; Pease v. Peck, 18 How. [59 U. S.] 595. The citations, however, with which I have contended myself suffice to settle in a clear light, and place in an impregnable position the grand harmonizing principle in the structure and action of our two sets of courts, namely, that in the domain of state laws they are construed for both by the state judiciary; that cases arising under the constitution, laws, and treaties of the United States, pertain to the supreme court, whose decisions thereon are binding on the state judiciary and upon the vast middle field of general jurisdiction, not at all dependent upon local statutes or local usages, embracing the doctrine of contracts and general commercial law. Each judiciary is left free for itself to explore all sources of legal science. and ascertain upon general reason and legal analogies the principles by which it shall be governed, subject to the deference and respect which educated and honest jurists will always gladly and emulously pay to the opinion of colaborers in the same exalted calling.

It only remains for me to illustrate, in the cases now under consideration, the practical operation of the principles which I have deduced from reasoning and authorities. The nature and extent of the homestead exemption is now finally settled in this state by its highest court. The supreme court of appeals has established a fixed rule by which the claims of creditors and the exemptions of the debtor shall be adjusted under creditors' bills or otherwise in the general liquidation which is now going on among our impoverished people. If this rule prevail. as I have undertaken to show it should prevail in the bankrupt court, then the citi-

zen, whether creditor or debtor, would be entitled to and receive in both forums the same treatment and relief under an equal administration of the same laws. But if it be otherwise, and this court be at liberty to establish a different rule, a deplorable contention would ensue between the courts, and there would be neither repose nor certainty for the prosperous development of business or the encouragement of commercial enterprise and activity. This antagonism and clashing of the courts would extend to their respective suitors, and breed strifes and discontents, destroying public confidence in our courts, and estranging the affections of the people from their governments. If the federal courts fail of the deference they owe to the state courts, how shall the latter be expected to submit to the authority of the former in the rightful jurisdiction of all cases arising under the constitution, the laws, and treaties of the United States? These consequences are not urged as conclusive, but as most persuasive, to show that we cannot entertain the belief that our judicial systems were so viciously contrived by their wise founders as to involve such pernicious collisions of judicial authority and action. But where the rule is such as to allow of my revising the judgments of the court of appeals, and dissenting from its construction of the homestead provision, the inquiry would pertinently arise whether or not I concurred in that decision. But as the case now stands, I am warranted in referring the inquirer, if any such there be, to sundry opinions which I delivered while on that bench, expressive of my sense of the judicial obligations to enforce contracts, and vindicative of their sanctity against the plausible excuses of revolutionary changes and losses, so that business should flow on in accustomed legal channels and honesty be maintained in all private transactions, notwithstanding the demoralization and disturbances incident to a devastating war, which the indiscretion, the incompetency. the wickedness of rulers had been allowed by an inscrutable Providence for its just ends to bring down on a misled people. I choose, however, that my decision shall rest on the well-established principle that I cannot sit in judgment on the court of appeals in its construction of the constitution of the state, and that my whole duty is discharged in ascertaining what that decision is, and what are its effect and operation on the cases in hand. It might be replied to this reasoning that inasmuch as the decision of the court of appeals was upon a clause of the constitution of the United States, it came within the very exception that I have already mentioned. This would have been so had the decision of the court been otherwise and against the rights claimed under the United States constitution; but it will be recollected that under the venerable 25th section of the judiciary

act [1 Stat. 85], as modified by act of February 5th, 1867 [14 Stat. 385], there is no right of appeal where the decision is against the validity of a statute assailed on the ground of its repugnance to the constitution of the United States. In such case the corrective power of the federal judiciary ceases. But in case of a contrary decision, a writ of error would lie to the supreme court of the United States, so that no one can lose his rights as asserted under the constitution of the United States without the sentence of the supreme court; but he can have no appeal there when such constitutional claims are not denied by the state tribunals. This is a logical consequence from the nature of our two governments, and necessary to maintain the supremacy of the general government within its sphere.

I have thus endeavored to present a connected view of my reasoning on this subject without turning aside to reply to the various arguments that have been addressed to me. Perhaps I have already incidentally indicated my leading reply to these arguments, but it may be well to notice especially a few objections to the view I have taken. The first and leading one is an argument ab inconvenienti. It is said that to follow the decision of our court of appeals is to create a distinction in debts at war with the fundamental principle of the bankrupt law, namely, equality of distribution after the satisfaction of liens; that this distinction would operate to the unequal satisfaction of creditors of the two classes into which they would be arrayed by this decision, and that the prescribed action of this court would be deranged by conforming to it. Concede that this consequence flows, where is its foundation? Certainly not in the act of congress, which merely adopts the state exemption, but rather in the state exemption itself. The vice is found in the homestead provision, and consists in the innovation thereby attempted of applying it to contracts "heretofore" made. To the honor of the state it may be said that in all her previous legislation having any bearing on contracts, the laws were always prospective, and the assembly instinctively revolted against the idea of turning back to affect past contracts. This inconvenience, then, is the product of reckless innovation, and cannot be traced to a faulty construction of the late act of congress. The effort is to construe it as adopting our homestead provision in totidem verbis, whereas it has no special reference to it, but includes it only under the generic phrase of "state exemption laws."

Another view is also based upon the fact of the act of congress preceding the decision of the court of appeals. It is inferred from this that congress gave the homestead exemption literally as it stood in our constitution. Had this decision been a new law out of the limits of time prescribed, there might have been some semblance of plausibility in it;

but it makes no law, it merely construes the exemption and ascertains what it amounts to. Hence, it does not matter when the decision was pronounced; its effect, whenever rendered, is to establish the true reading of this clause. If it had not been made at this time I should have been left free to construe it for myself, but, whenever made, it becomes a part of the law which I have to administer, and I must implicitly follow it.

Another question is made as to the application and operation of this amendatory act to pending cases of bankruptcy. It is clearly prospective; but, as a remedial act, it may be availed of in all pending cases where assets are undistributed, and the enlarged exemption can be granted without prejudice to the interests already vested before the passage of the act. When congress chooses to increase this bounty it would be hard to discriminate between the applicant before and the applicant after the act, when the case of each was such as to put it in the power of the court, without the invasion of vested interests, to give both alike the benefit of the enlarged exemption. The contrary view is based upon the idea that the deed of assignment vests the title to the assignee in behalf of creditors, and divests to that extent the title of the bankrupt to his exemptions, but the direct opposite is plainly declared in the 14th section of the bankrupt law by the proviso, "that the foregoing exception shall operate as a limitation upon the conveyance of the property of the bankrupt to his assignees. And in no case shall the property hereby excepted pass to the assignee, or the title of the bankrupt thereto be impaired or affected by any of the provisions of this act."

It has also been contended in these cases that inasmuch as the exempted property is held independently of the deed of assignment, the claimant takes cum onere, and the lienor must follow it elsewhere for his satisfaction. This pretension rests upon the authority of a case from the district court of California. In re Hunt [Case No. 6,883]. I do not know enough of the nature and provisions of the California homestead, nor of their local laws and judicial proceedings, to weigh the considerations that may have induced this decision, but in this state I should feel, if I followed this authority, and should turn away the judgment creditor, when the assets liable to his demand are in my hands, to a state court, I should be derelict in my duty and should abnegate my rightful authority to provide for the liquidation of liens in this court.

2 [Many arguments and considerations, derived from the war and its results in the loss of property and the impoverishment of our people, have been pressed on me with fervor and eloquence, as incentives to earnest and careful investigation of the important ques-

tions at issue; they have been felt and weighed by me; but as appeals or motives for relief they belong to a wholly different forum from that which administers the laws, but has no power to modify them to meet the public wants or wishes. I am not insensible of the disappointment which this decision will give to a number of suitors in the courts of my district. An impression has been widely disseminated that the late act of congress would have the effect of giving validity to the homestead provision in the form and language in which it stands in the constitution. This was a vague and loose impression, arising from a cursory examination of the question, rather than from a close legal scrutiny which it demands for a satisfactory solution. Unfortunately, the press of the state has given currency to this impression. Without exerting its influence to prepare the public mind to await with serenity the judicial decision that, in the nature of things, could not long be delayed, some, without thought or inquiry, have hastened to predicate, on wholly insufficient data, their confident prophecies of a decision favorable to their views or interests; while another paper at the seat of government, with metropolitan influence and circulation, has not hesitated to seize with impatience these unauthorized rumors and speculations, and, in spite of all precedent and all decency, in the spirit of depraved journalism, and through a prurient taste for partisan detraction, has made them the occasion and the means of misleading and irritating the public mind, by falsely assuming what would be the decision of this court, and thus contemptuously arraigning and discrediting it in advance before the public. As but little credit is given now-a-days to newspaper editorials or correspondence, so that the sensitive man incurs the risk of being laughed at for his folly in seeking to correct them, nevertheless I used every precaution through proper channels to correct false ideas, to secure for myself time for deliberation, and stay the public judgment till it might receive with candor the formal adjudication, under the sanction of legal proceedings and observances. If the public mind is no longer in that state of equanimity which is desirable for the calm consideration of this question, I am in nowise responsible for its disturbance, and so far as I am personally concerned by these strictures of the press, I may be pardoned for indulging the humble hope that I may be able to live above them and be unaffected by them, in the opinion of capable and impartial men, whose judgment alone is of value to me. I do not suppose this is an occasion where one is likely to be betrayed by his feelings. It is a mistake to suppose, as a general thing, that our people can be divided into two distinctive classes of creditors and debtors. It was well said, by one of the counsel for defendants to these motions, that these attributes were usually

---

2 [From 5 Am. Law T. Rep. U. S. Cts. 330.]

interchangeably combined in the same individual, so that the embarrassed debtor, upon getting his legal dues, might either emerge from his class into the other, or else might at least escape the necessity of becoming a petitioner in bankruptcy. But were it otherwise, and were the case a clearer one for the sway of private sympathies and inclinations, all must feel and admit that they cannot intrude on this bench, and must yield here to the convictions of reason and judgment, matured by anxious reflections and able arguments. But the claimant of the homestead must remember he now obtains all that the constitution of the United States allows him, and even that may be jeoparded if the opposite doctrine should prevail, so that the state in some future convention might enact a retrospective repeal of it, with the same propriety with which it sought to interpret the original enactment as retrospective. In this way present losses are often compensated in the view of considerate sufferers by the greater and pervading good of adhering to the laws as interpreted by their constitutional expounders upon enduring principles, sanctioned by the wisdom and fortified by the experience of mankind in all ages and nations.' There still remains the right of homestead—prospective in character, and good against all debts contracted after knowledge and upon the faith of it; but no homestead under the sting and reproach of vacating contracts made without notice of it. In the responsibility I bear and feel upon this occasion, I felicitate myself in the fact, that if I have erred in my judgment, the error admits, in a summary way, and with inconsiderable costs, of speedy correction by a superior tribunal. The counsel in these cases will be pleased to hand me sketches of decrees in conformity with this opinion.] 3